|  |  |
|---|---|
| FARERE DYER, | ) )  Case No.: |
| Plaintiff, | ) ) |
| v. | )  Judge: ) |
| SCRIPPS MEDIA, INC. D/B/A NEWS | )  Magistrate Judge: ) |
| CHANNEL 5, | ) ) |
| Defendant. | )  **JURY DEMAND** ) |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

### I.    INTRODUCTION

1.      This is an action to vindicate the rights and reputation of Dr. Farere Dyer, M.D., who has suffered irreparable harm as a result of defamatory statements and false light portrayals published and broadcast by Defendant Scripps Media, Inc. ("Scripps"), owner of News Channel 5. Through a series of knowingly false, and/or reckless and misleading reports spearheaded by reporter Jennifer Kraus, Scripps disseminated falsehoods regarding Dr. Dyer's qualifications, professional conduct, and character, including the false statements that Dr. Dyer was "not a doctor" and engaged in unauthorized and improper medical practices. These actions have caused profound personal and professional harm to Dr. Dyer, who seeks to hold News Channel 5 and Scripps accountable under Tennessee law for defamation and false light invasion of privacy.

### II.    NATURE OF THE ACTION

2.      This action arises under the common law of Tennessee, specifically claims for defamation (including defamation per se and per quod) – for knowingly and recklessly publishing false and defamatory statements concerning Dr. Dyer; and false light invasion of

privacy – for publicly portraying Dr. Dyer in a false, misleading, and highly offensive manner that would be objectionable to a reasonable person.

3.      Defendant's conduct constitutes an egregious breach of journalistic standards and a knowing and/or reckless disregard for the truth, necessitating both injunctive relief and significant compensatory and punitive damages to redress the harm caused.

### III.    THE PARTIES

4.      Plaintiff Dr. Farere Dyer, M.D., is a citizen of Tennessee and resides in this District.

5.      Defendant Scripps is a corporation organized and existing under the laws of Delaware, with its principal place of business located in Cincinnati, Ohio.

6.      Scripps conducts substantial business operations within the Middle District of Tennessee and targeted at the Middle District of Tennessee, including operating News Channel 5, NewsChannel5.com, and the News Channel 5 YouTube channel.

7.      Each of News Channel 5, NewsChannel5.com, and the News Channel 5 YouTube channel has been used by Scripps to publicize defamatory statements that are the subject of this action.

### IV.    JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 (diversity jurisdiction), as the parties are citizens of different states and the amount in controversy exceeds $75,000.

9.      Venue is proper in the Middle District of Tennessee under 28 U.S.C. § 1391, as the defamatory acts giving rise to this action occurred in this District, and Defendant conducts substantial business operations in this District.

## V.    FACTUAL BACKGROUND

10.    Plaintiff Dr. Farere Dyer holds a Doctor of Medicine (M.D.) degree from St. Christopher Iba Mar Diop College of Medicine ("St. Christopher's"), from which he graduated in 2007. Dr. Dyer received his academic (didactic) training at the Luton campus of St. Christopher's in Luton, England and his practical rotational training at the Emory University hospital system in Atlanta, GA. A copy of Dr. Dyer's diploma from St. Christopher's is attached as Exhibit 1.

11.    Dr. Dyer holds an Associate's Degree in Biology from Boston University and completed post-graduate coursework in Anatomy and Biochemistry at Louisiana State University. Additionally, Dr. Dyer has participated in enrichment programs at Howard University and the Institute for American Universities in France.

12.    During, and in the year following his graduation from, medical school, Dr. Dyer gained clinical training through a series of rotations.

13.    Rotations for medical students and recent graduates are structured periods of clinical training in various medical specialties. These rotations are a critical component of medical education, allowing students to gain practical, hands-on experience in real-world medical settings under the supervision of licensed physicians. Each rotation focuses on a specific field, such as Internal Medicine, Pediatrics, or Obstetrics and Gynecology, and provides the student with exposure to the breadth and depth of medical practice. Through these experiences, students and recent graduates develop essential clinical skills, patient management techniques, and a deeper understanding of specialty-specific knowledge.

14.    Dr. Dyer completed multiple core rotations in Internal Medicine under the guidance of Dr. Bamidele Adesunloye and Dr. Jean-Joseph Philippe at Atlanta Medical Center in Atlanta, Georgia. These rotations focused on patient diagnosis, treatment planning, and chronic disease management.

15.     Dr. Dyer trained in Obstetrics and Gynecology under Dr. George Tucker at Atlanta Medical Center. This rotation involved hands-on experience in prenatal care, labor and delivery, and gynecological procedures.

16.     Dr. Dyer completed his Pediatrics rotation at Emory Crawford Long Hospital in Atlanta, Georgia, under Dr. Booker Poe. He gained experience in managing pediatric illnesses, conducting wellness checkups, and supporting developmental care for children.

17.     At Kennestone/Cobb Hospital, Dr. Dyer worked under Dr. James M. Tallman during his Radiology elective. This rotation provided him with experience in interpreting diagnostic imaging, including X-rays and CT scans.

18.     Dr. Dyer pursued an elective in Otolaryngology at South Fulton Hospital in Atlanta, Georgia, under Dr. Lisa Perry-Gilkes. This rotation included training in diagnosing and managing conditions related to the ear, nose, and throat.

19.     Dr. Dyer trained in Family Medicine at Atlanta Medical Center under Dr. Millard J. Collier, Jr. This rotation emphasized comprehensive care for patients across all age groups, focusing on preventive health and chronic disease management.

20.     After completing these rotations, Dr. Dyer participated in multiple medical externships.

21.     A medical externship is a structured training experience that allows medical graduates to gain practical, hands-on exposure in clinical environments under the supervision of licensed physicians. These experiences help bridge the gap between academic learning and independent medical practice, equipping participants with essential skills and real-world application of medical knowledge.

22.     Dr. Dyer participated in a series of medical externships that provided hands-on clinical experience and strengthened his practical medical skills.

23.     From May 2010 to May 2012, Dr. Dyer served as a Medical Extern under Dr. Millard D. Collins at Clinica La Paz in Nashville, Tennessee. In this role, Dr. Dyer gained experience in family medicine, focusing on holistic patient care across diverse demographics.

24.     From July 2014 to May 2018, Dr. Dyer worked under Dr. Concepcion G. Martinez at Medicos Nashville Family Medicine, also in Nashville, Tennessee, where he acquired further experience in outpatient care and chronic disease management.

25.     From November 2018 to June 2020, Dr. Dyer returned to Clinica La Paz under Dr. Collins, expanding his scope of practice to include comprehensive patient evaluations and care coordination.

26.     These externships provided Dr. Dyer with opportunities to apply his medical knowledge in real-world settings while learning under experienced physicians.

27.     After graduating from medical school, Dr. Dyer engaged in the Educational Commission for Foreign Medical Graduates (ECFMG) certification process.

28.     The ECFMG process evaluates the qualifications of international medical graduates (IMGs).

29.     All international medical graduates from any foreign medical school must go through the ECFMG certification process, regardless of the school from which they graduated.

30.     Schools must meet ECFMG's requirements for their students and graduates to be eligible to apply for ECFMG certification.

31.     If a school meets the ECFMG requirements for their students and graduates to be eligible to apply for ECFMG certification, the school will be listed in the ECFMG World Directory.

32.     The school from which Dr. Dyer graduated is currently, and was at the time of his graduation, listed in the ECFMG World Directory, and its graduates are therefore eligible for ECFMG certification.

33.     The process for ECFMG certification includes:

- Application: Applicants submit an online application and a notarized Certification of Identification Form (Form 186);

- Medical school verification: ECFMG verifies the applicant's medical school status;

- USMLE exam: Applicants must pass Steps 1 and 2 Clinical Knowledge (CK) of the United States Medical Licensing Examination (USMLE);

- Communication skills: Applicants must pass the Occupational English Test (OET) Medicine;

- Credential verification: ECFMG reviews the applicant's medical school credentials and compares them to sample documents;

- Communication with medical school: ECFMG may contact the applicant's medical school to request verification of the credentials; and

- Notification: Applicants are notified online when they have been certified.

34.     The ECFMG is the only body with nationwide authority to determine whether a foreign medical school meets the requirements for its graduates to pursue a medical license in the United States.

35.     The ECFMG is the only body with nationwide authority to certify whether an international medical school graduate has met the requirements to pursue a medical license in the United States.

36.     The ECFMG determined that the medical school from which Dr. Dyer graduated met the requirements for its graduates to pursue a medical license in the United States.

37.     The ECFMG certified that Dr. Dyer met the requirements to pursue a medical license in the United States.

38.     Dr. Dyer undertook at least one component of the USMLE each year from 2008 to 2018.

39.     Dr. Dyer has passed Step 1 and Step 2 of the USMLE.

40.     From March 2020 until March 2024, Dr. Dyer was employed at the Center for Reproductive Health (CRH).

41.     Dr. Dyer's employment at CRH was under the supervision of Dr. Jaime Vasquez, a licensed Tennessee physician.

42.     CRH was a reproductive healthcare clinic specializing in fertility treatments, including in vitro fertilization (IVF), intrauterine insemination (IUI), egg preservation, and hormonal therapy. The clinic also offered comprehensive reproductive endocrinology services and patient counseling, providing individualized care to patients seeking assistance with family planning and fertility challenges.

43.     IUIs involve placing sperm directly into a woman's uterus using a catheter.

44.     Under Tennessee law and standard medical practices, IUIs can be performed by individuals without medical licenses who are operating under the supervision of a licensed physician, including nurses.

45.     Dr. Dyer was appropriately authorized to, and did, perform intrauterine insemination (IUI) procedures while employed at CRH.

46.     Dr. Dyer also engaged in non-procedural tasks such as educating new patients about treatment options, overseeing the collection of diagnostic information through ultrasounds and hormone level lab tests, and discussing the results of these tests with patients to provide clear and informed guidance.

47.     All these tasks were conducted within the bounds of Dr. Dyer's role as an employee supervised by Dr. Vasquez and in adherence to Tennessee medical regulations.

48.     Dr. Dyer did not perform any procedures at CRH that are required to be performed by a licensed medical doctor.

49.     Dr. Dyer did not perform egg retrievals.

50.     Dr. Dyer did not perform in vitro fertilization (IVF).

51.     Dr. Dyer did not practice anesthesiology or administer general anesthesia to any patient.

52.     Dr. Dyer was not responsible for choosing or developing treatment plans at CRH.

53.     In its November 2024 letter to patients of CRH, the Tennessee Department of Health ("DoH") confirmed that Dr. Dyer's actions at CRH did not constitute unauthorized practice of medicine.

54.     When introducing himself to CRH patients, Dr. Dyer would generally make a statement to the effect that his name was Farere Dyer, that most people call him Dr. Dyer, and that he was Dr. Vasquez's "fellow" or "extern".

55.     Dr. Dyer's white lab coat included the word "Fellow" beneath his name.

56.     Dr. Dyer's name was not listed on the sign at the CRH entrance, which listed Dr. Vasquez and no other names.

57.     To formalize a medical fellowship for review by licensing authorities such as the Tennessee BME, the sponsoring physician must sign and file certain paperwork setting forth the fellowship specifications with an academic institution with which the fellowship is affiliated. In November of 2023, after Dr. Dyer had already spent nearly four years working as Dr. Vasquez's fellow, Dr. Vasquez told Dr. Dyer that he would not sign the final paperwork formalizing Dr. Dyer's fellowship for review by licensing boards.

58.     Dr. Dyer submitted a letter resigning his position on January 30, 2024, with his resignation effective March 8, 2024.

59.     CRH closed in early April 2024, after Dr. Dyer had left employment there. On information and belief, the closure was due to financial difficulties.

60.     On April 8, 2024, News Channel 5 broadcast and published stories regarding the closure of CRH.

61.     In April 2024, an employee of News Channel 5, reporter Jennifer Kraus, contacted Dr. Dyer requesting an interview.

62.     In a short phone call, Dr. Dyer provided some information to Ms. Kraus, including that he served as Dr. Vasquez's extern/fellow and conducted patient education.

63.     Ms. Kraus asked for further information and a full interview from Dr. Dyer. Although initially open to the idea, Dr. Dyer ended up declining to provide Ms. Kraus an interview and decided to provide Ms. Kraus no further information.

64.     After Dr. Dyer informed Ms. Kraus that he did not feel comfortable providing an interview or further information, Ms. Kraus continued to contact Dr. Dyer and became increasingly hostile when Dr. Dyer did not respond.

65.     On May 2, 2024, Ms. Kraus came without permission to Dr. Dyer's personal residence with a News Channel 5 van and appeared to be filming a story. Dr. Dyer called the police, citing his concerns relating to privacy for his family. A true and correct copy of the police report relating to this incident is attached as Exhibit 2.

66.     On May 6, 2024, Defendant published and broadcast stories including numerous false and defamatory statements pertaining to Dr. Dyer.

67.     Defendant's YouTube posting of this broadcast is entitled in part, "[h]e wasn't even a doctor." referring to Dr. Dyer.  A true and correct screenshot of Defendant's YouTube posting of the May 6, 2024 broadcast is attached as Exhibit 3.

68.     The May 6, 2024 broadcast and accompanying article claimed that Dr. Dyer was "not" "a doctor".  A true and correct copy of the May 6, 2024 article is attached as Exhibit 4.

69.     This broadcast included the question, "Why did the man who treated so many women hold himself out to be a doctor when, believe it or not, he is not?", referring to Dr. Dyer.

70.     Defendant's assertion that Dr. Dyer "wasn't even a doctor" was false.

71.     Dr. Dyer holds an M.D. degree from St. Christopher Iba Mar Diop College of Medicine.

72.     As a holder of an M.D. degree, Dr. Dyer is entitled to use the title "doctor" in accordance with American Medical Association (AMA) guidelines.

73.     Defendant's broadcast and story implied that Dr. Dyer "h[e]ld himself out to be a doctor" deceitfully.

74. This implication is also false. Dr. Dyer is a doctor and was transparent with patients about his role under Dr. Vasquez's supervision.

75. Defendant's reports failed to clarify that Dr. Dyer performed only tasks permitted under Tennessee law, including intrauterine inseminations (IUIs) and patient education, all of which were conducted under Dr. Vasquez's appropriately delegated authority and oversight. Defendant created the false impression that Dr. Dyer was acting improperly or illegally.

76. Defendant's misrepresentations in the May 6, 2024 broadcast and article were not only false and misleading but also recklessly ignored easily available evidence verifying Dr. Dyer's qualifications and authorization to perform the procedures he performed.

77. In the May 6, 2024 broadcast, Ms. Kraus additionally stated that "we found degrees from the medical school he claims he graduated from in England in 2008, St. Christopher's College of Medicine, are not recognized or accepted for licensure in either Britain or many states in the U.S., including apparently Tennessee."

78. In fact, Tennessee permits graduates of St. Christopher's to obtain licensure through the standard process for international medical school graduates.

79. Information regarding the ECFMG process outlined above is easily available via a basic Google search.

80. The status on the World Directory of the medical school from which Dr. Dyer graduated is also easily available via a basic internet search.

81. Defendant's statement created the false inference that St. Christopher's was uniquely inadequate or disqualifying for Tennessee licensure, which is not the case.

82. No foreign medical school is directly accepted for licensure in the United States, and graduates of all foreign medical schools must complete additional steps, such as the ECFMG certification process and USMLE.

83. Defendant's implication that Dr. Dyer's medical education was inferior unfairly cast his credentials in a false light.

84. Prior to News Channel 5's reporting on CRH, Dr. Dyer was known professionally within his role as a medical fellow under Dr. Vasquez's supervision at CRH but had not sought public attention or engaged in matters of public controversy. Dr. Dyer's professional activities were confined to his employment at CRH, and he had no prior media exposure or involvement in public-facing disputes. As such, any public attention he received arose solely from Defendant's reporting, which catapulted his name into public discourse and falsely characterized his professional role.

85. On May 10, 2024, Defendant published and broadcast stories including numerous false and defamatory statements pertaining to Dr. Dyer. A true and correct copy of the May 10, 2024 article is attached as Exhibit 5.

86. Defendant claimed that Dr. Dyer "claimed to be their doctor" referring to patients of CRH.

87. Defendant's broadcast included the statement, "You have to be licensed by the state of Tennessee to do a procedure, and from our initial investigation, there were procedures being done that would require a licensed physician."

88. This statement suggested that Dr. Dyer performed medical procedures that required a medical license and thus implied that such actions were unlawful.

89.     This statement was false and misleading. Dr. Dyer only performed tasks as allowed under Tennessee BME regulations. These tasks included intrauterine inseminations (IUIs), which are lawful to be performed by a person without a medical license under the supervision of a licensed physician.

90.     The May 10, 2024 article stated, "Metro police then set up a special email box so women who'd been patients at the clinic, especially Farere Dyer's could contact them. . . . And less than 48 hours later after that email address had been set up, police had already heard from 46 women."

91.     The May 10, 2024 article further stated, "Some of these cases are going to have criminal consequences."

92.     The reference to "some of these cases" in the May 10, 2024 article pertained to investigations resulting from outreach to the Nashville police department regarding CRH at the "special email box".

93.     The May 10, 2024 article created the false impression that Dr. Dyer had engaged in criminal activity.

94.     These statements from the May 10, 2024 broadcast and accompanying article were false, misleading, and damaging to Dr. Dyer's reputation.

95.     On May 29, 2024, Defendant published and broadcast additional false and defamatory statements about Dr. Dyer, mischaracterizing his professional conduct and role at CRH.

96.     The May 29, 2024 broadcast stated, "The man they thought was a doctor, who had performed procedures on them, wasn't who he'd claimed to be."

97.     This was false as Dr. Dyer holds a valid M.D. degree and did not claim to be a licensed doctor.

98.     In the May 29, 2024 broadcast, Defendant aired a patient's statement, "Dr. Dyer slept me for my first IVF egg removal so that's like invasive and what not in and of itself and putting catheters in and putting someone under."

99.     In the accompanying May 29, 2024 article, Defendant paraphrases this statement as "Dr. Dyer (put me to sleep) for my first IVF egg removal so that's like invasive and what not in and of itself and putting catheters in and putting someone under".  A true and correct copy of the May 29, 2024 article is attached as Exhibit 6.

100.    Defendant further stated in the May 29, 2024 article, "While we knew that Dyer had performed a number of less invasive intrauterine inseminations or IUIs, we learned here, according to his patients, that he also did more complex procedures as well."

101.    These statements indicate that Dr. Dyer practiced anesthesiology.

102.    These statements were false and misleading because Dr. Dyer did not practice anesthesiology.

103.    These statements indicate that Dr. Dyer performed invasive procedures.

104.    These statements were false and misleading because Dr. Dyer did not perform invasive procedures.

105.    On August 30, 2024, Defendant published and broadcast further false and defamatory statements about Dr. Dyer, continuing to misrepresent his role and actions at CRH. A true and correct copy of the August 30, 2024 article is attached as Exhibit 7.

106.    The August 30, 2024 broadcast stated, "We exposed he was treating patients at the fertility clinic," referring to Dr. Dyer.

107.    "Treating" a patient as a doctor means to provide medical care and management to a patient by actively assessing their health condition, diagnosing any illnesses or injuries, formulating a treatment plan, and implementing that plan through interventions like medication, surgery, or other therapeutic measures.

108.    Dr. Dyer did not treat patients; rather, Dr. Dyer—along with the other employees at CRH—helped to implement treatment plans under Dr. Vasquez's supervision that were created and chosen by Dr. Vasquez.

109.    On September 5, 2024, Defendant published and broadcast additional false and defamatory statements about Dr. Dyer, misrepresenting his actions and role at CRH.

110.    The title of Defendant's September 5, 2024 article is "Fertility clinic patients angry over DA's decision not to charge man who treated them but was not a doctor." A true and correct copy of the September 5, 2024 article is attached as Exhibit 8.

111.    The September 5, 2024 article states, "Dyer is not a doctor and he has never had a license to practice medicine."

112.    The September 5, 2024 article further states, "Dyer . . . was seeing patients at the fertility clinic, performing invasive procedures and touching women as only their doctor might. And his patients believed he was a doctor."

113.    The September 5, 2024 broadcast and article also include the language "what Dyer had done appeared to be sexual assault."

114.    The September 5, 2024 broadcast also displays a letter from the office of DA Glenn Funk, entitled "Re: Decision Not to Prosecute in the Case of Dr. Farere Dyer and the Center for Reproductive Health".

115.   The September 5, 2024 broadcast and article state that, "according to the DA's letter, the facts in this case do not meet the legal requirements to pursue rape by fraud charges because there's not enough evidence to pursue the charge."

116.   The text of the DA's letter includes the following: "After a thorough review of the allegations against Dr. Farere Dyer and the Center for Reproductive Health, our office has determined that the facts of the case do not meet the legal requirements necessary to pursue a criminal prosecution for rape by fraud under Tennessee law. ... In Tennessee, the charge of rape by fraud is narrowly defined and requires the fraudulent act to ... relate to the nature of the sexual act itself."

117.   The DA's letter also states, regarding certain facts of the case, that "these do not meet the stringent criteria set forth by our state's legal precedent, specifically as established in the *State v. Mitchell* case."

118.   Defendant mischaracterized the letter as indicating there was "not enough evidence to pursue the charge," when, in fact, the District Attorney had affirmatively determined that the legal elements required to prosecute the alleged crime were not met. By selectively presenting the facts and falsely implying that Dr. Dyer avoided prosecution due to insufficient evidence, Defendant misled the public, perpetuating a defamatory and highly damaging narrative that falsely imputed criminal conduct to Dr. Dyer.

119.   In the September 5, 2024 broadcast and article, Defendant aired and published a statement claiming, "To me, if you would say you are a physician and you are not, then you're an imposter. That's criminal."

120.    Defendant's September 5, 2024 broadcast and article included the statement, regarding Dr. Dyer, that he "knew . . . every day when he put that coat on" that he was not "licensed to do any of it."

121.    On October 21, 2024, Defendant published and broadcast additional false and defamatory statements about Dr. Dyer, continuing to misrepresent his actions and role at CRH. A true and correct copy of the October 21, 2024 article is attached as Exhibit 9.

122.    Defendant's October 21, 2024 broadcast claimed that Dr. Dyer "developed patient treatment plans" and "came up with fertility drug prescriptions."

123.    All treatment plans and prescriptions at CRH were developed, selected, and approved solely by Dr. Jaime Vasquez, the supervising physician.

124.    Dr. Dyer's role with respect to treatment plans was limited to collecting and reviewing diagnostic and patient biographical information, recommending which of Dr. Vasquez's pre-developed treatment plans may be best, for Dr. Vasquez's decision and approval, and assisting with routine implementation of the treatment plan that Dr. Vasquez chose.

125.    On November 12, 2024, at approximately 1:00 PM, Dr. Dyer became aware that Defendant intended to broadcast an additional story about him on the evening news that day.

126.    Before 3 PM on November 12, 2024, counsel for Dr. Dyer notified Defendant and Defendant's counsel that Defendant's reporting regarding Dr. Dyer had included numerous false and defamatory statements, such as that Dr. Dyer was "not a doctor", and that any further reporting repeating these statements would be defamatory as well.

127.    Counsel for Defendant replied that afternoon, stating in part that "News Channel 5 is not aware of any false and defamatory statements" in the story it planned to air regarding Dr. Dyer.

128.     At the time Defendant's counsel sent its response, Defendant was in possession of a letter sent to a CRH patient by the Director of the Office of Investigations of the Tennessee Department of Health (the "DoH Closure Letter"), stating that the "complaint against Farere Dyer has been closed due to lack of evidence of a practice act violation" and that "there was not sufficient evidence to conclude that Farere Dyer practiced medicine in Tennessee without a license."

129.     Prior to the evening of November 12, 2024, Defendant had been notified that its upcoming broadcast would include defamatory statements regarding Dr. Dyer.

130.     Defendant nonetheless broadcast and published additional false and defamatory statements about Dr. Dyer, further misrepresenting his role at CRH and his professional conduct. A true and correct copy of the November 12, 2024 article is attached as Exhibit 10.

131.     Defendant's November 12, 2024 broadcast declared in reference to Dyer, "Women thought he was a doctor, but that wasn't the case at all. He wasn't a doctor and didn't have a license to practice medicine."

132.     A reasonable hearer of this statement would understand it to mean that Dr. Dyer did not possess an M.D. degree, as the use of "at all" and distinction between being "a doctor" and "hav[ing] a license to practice medicine" would reasonably cause viewers to understand the statement as pertaining to Dr. Dyer's academic qualifications and not just his licensure status.

133.     Defendant's November 12, 2024 broadcast stated that Dr. Dyer was "knowingly treating these patients without a license."

134.     Defendant's November 12, 2024 article states that "sources tell us the reason charges were never filed was that the Tennessee Department of Health told DA Glenn Funk to drop the case."

135.    Defendant had previously reported a different reason charges were not brought by the DA's office, which Defendant articulated as "not enough evidence to pursue the charge" in its September 5, 2024 article.  Defendant thus knew that its reporting was false.

136.    Defendant's November 12, 2024 broadcast included excerpts from prior broadcasts about Dr. Dyer, including the allegation from the May 29, 2024 broadcast that Dr. Dyer practiced anesthesiology in the context of an IVF egg retrieval.

137.    Defendant's November 12, 2024 written article included the allegation that Dr. Dyer practiced anesthesiology in the context of an IVF egg retrieval.

138.    At the time of Defendant's November 12, 2024 broadcast, Defendant was in possession of the DoH Closure Letter.

139.    The November 12, 2024 broadcast and accompanying written article included multiple allegations that were directly contradicted by the DoH Closure Letter.  Defendant knew that its allegations were contradicted by the DoH Closure Letter, and therefore false, at the time it broadcast and published the allegations.

140.    Defendant further claimed in its November 12, 2024 written article that "Dyer also performed more complex procedures, according to other patients' medical records".

141.    The statement regarding "more complex procedures" referred to procedures that were more complex than IUIs.

142.    The statement regarding "other patients' medical records" refers to CRH patients.

143.    No medical record exists of Dr. Dyer performing a procedure at CRH that is more complex than an IUI.

144.    Dr. Dyer did not perform any procedure at CRH that was more complex than an IUI.

145. These statements painted a false and defamatory narrative about Dr. Dyer, misrepresenting his professional role and casting aspersions on his character. Especially egregious was Defendant's decision to re-run some of the most defamatory allegations of impropriety on Dr. Dyer's part after learning, as a result of the DoH Closure Letter and from Dr. Dyer's counsel directly, that those allegations were false.

146. As a direct result of these broadcasts and articles, Dr. Dyer has suffered irreparable harm to his reputation, career prospects, and personal well-being.

147. In addition to being false and defamatory, Defendant's broadcasting and publication of the November 12, 2024 broadcast and article when it was on actual notice that its allegations of unlicensed practice were unsubstantiated violated the Scripps Journalism Ethics Guidelines, which state in relevant part: "For stories that are in-depth, original in research and reporting or involve the unearthing of hidden information, additional fact-checking must be built into the production and editing timeline. This may include following up with sources, confirming that quotes are accurately represented, rechecking data and making sure factual points are not taken out of context." A true and correct copy of the Scripps Journalism Ethics Guidelines is attached as Exhibit 11.

148. Dr. Dyer has been actively seeking employment both in the health care industry and other areas since April 2024, but as a result of Defendant's false and defamatory reporting, he has been unable to secure employment despite being invited to interview for multiple positions.

## COUNT I: DEFAMATION

149. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

150. Defendant published false and defamatory statements concerning Plaintiff, including but not limited to assertions that Plaintiff was "not a doctor," "performed procedures"

improperly, and engaged in unethical or criminal conduct such as "sexual assault" and "impersonating a licensed physician".

151.    These statements were published with actual malice, reckless disregard for the truth, or gross negligence, as Defendant failed to verify their accuracy despite evidence readily available to refute them, failed to adequately investigate Dr. Dyer's credentials, and relied on unreliable sources.

152.    At least the November 12, 2024 broadcast and publication were made when Defendant was on actual notice that its story, including its characterization of Dr. Dyer as "not a doctor," would be defamatory. Defendant's decision to proceed with broadcasting and publishing the story under these circumstances constitutes actual malice.

153.    Plaintiff was a private figure at all times, including but not limited to the time of the initial defamatory broadcasts and publications.

154.    Plaintiff has suffered significant harm, including reputational damage, emotional distress, and financial loss, as a direct and proximate result of Defendant's defamatory conduct.

155.    Defendant's defamatory statements harmed Dr. Dyer's reputation, causing him significant emotional distress and professional damage. For example, Dr. Dyer has been significantly impaired from seeking employment both within and outside of the health care industry as a result of Defendant's defamatory reporting.

156.    The statements published by Defendant accusing Dr. Dyer of criminal impersonation, sexual assault, and improper medical practice constitute defamation per se under Tennessee law. These statements impute to Dr. Dyer conduct incompatible with the proper exercise of his profession and tend to injure him in his profession. As a result of these defamatory statements, Dr. Dyer is entitled to presumed damages.

157.    The harm to Dr. Dyer's reputation is irreparable and as a result Dr. Dyer has no adequate remedy at law.

## COUNT II: FALSE LIGHT INVASION OF PRIVACY

158.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

159.    Defendant's publications and broadcasts portrayed Plaintiff in a false and highly offensive light, including false and misleading implications that he was unqualified, deceitful, and engaged in improper medical practices and criminal conduct, including sexual assault.

160.    Defendant's publications and broadcasts indicating that Dr. Dyer was not a licensed doctor and performed procedures for which a medical license was required were false and misleading and created the false light impression that Dr. Dyer was required to be licensed to perform procedures such as IUIs, and/or performed procedures more complex than an IUI.

161.    Defendant's publications and broadcasts created a false impression of Dr. Dyer that would be highly offensive to a reasonable person, causing him significant emotional distress and reputational harm.

162.    Defendant acted with actual malice or reckless disregard for the truth in publishing these false and misleading statements.

163.    As a result, Plaintiff has experienced severe emotional distress, humiliation, and reputational harm.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for relief as follows:

A. That judgment be entered in Plaintiff's favor and against Defendant on all claims;

B. Injunctive Relief: An order requiring Defendant to issue a full and prominent retraction of all false, defamatory, misleading, and tortiously invasive statements made about Dr.

Dyer and to remove all related defamatory or false-light content from its platforms, including online articles and videos;

B. Compensatory Damages: In an amount sufficient to compensate Plaintiff for the harm to his reputation and career and emotional distress, to be determined at trial.

C. Punitive Damages: In an amount sufficient to punish Defendant for its malicious, reckless, and defamatory conduct and deter similar conduct, to be determined at trial.

D. That Plaintiff be awarded pre- and post-judgment interest on the damages;

E. That Plaintiff be awarded his reasonable attorneys' fees and costs incurred in this action to the extent permitted by law; and

F. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,


/s/Chanelle Acheson
Chanelle Acheson (TN BPR #30008)
**Waddey Acheson LLC**
1030 16th Ave S, Suite 300
Nashville, TN 37212
615-839-1100
chanelle@waddeyacheson.com