UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| FARERE DYER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:25-cv-00099 |
| | ) | |
| SCRIPPS MEDIA, INC. | ) | Judge Richardson |
| d/b/a NEWSCHANNEL 5, | ) | Magistrate Judge Frensley |
| | ) | |
| Defendant. | ) | |

## ANSWER AND AFFIRMATIVE DEFENSES

Pursuant to Federal Rule of Civil Procedure 12(a), Defendant provides its Answer to Plaintiff's Verified Complaint.

## ANSWER

All allegations not expressly admitted are denied, and any factual averment admitted is admitted only as to the specific facts and not as to any conclusions, characterizations, or implications contained in Plaintiff's Complaint. Defendant denies any allegations contained in headings, headers, or unnumbered paragraphs of Plaintiff's Complaint. Defendant further states as follows in response to the Complaint's corresponding numbered allegations:

## I.     INTRODUCTION

1.     This is an action to vindicate the rights and reputation of Dr. Farere Dyer, M.D., who has suffered irreparable harm as a result of defamatory statements and false light portrayals published and broadcast by Defendant Scripps Media, Inc. ("Scripps"), owner of NewsChannel 5. Through a series of knowingly false, and/or reckless and misleading reports spearheaded by reporter Jennifer Kraus, Scripps disseminated falsehoods regarding Dr. Dyer's qualifications,

professional conduct, and character, including the false statements that Dr. Dyer was "not a doctor" and engaged in unauthorized and improper medical practices. These actions have caused profound personal and professional harm to Dr. Dyer, who seeks to hold NewsChannel 5 and Scripps accountable under Tennessee law for defamation and false light invasion of privacy.

**ANSWER:** **Denied.**

## II.     NATURE OF THE ACTION

2.      This action arises under the common law of Tennessee, specifically claims for defamation (including defamation per se and per quod) – for knowingly and recklessly publishing false and defamatory statements concerning Dr. Dyer; and false light invasion of privacy – for publicly portraying Dr. Dyer in a false, misleading, and highly offensive manner that would be objectionable to a reasonable person.

**ANSWER:  These allegations are legal conclusions to which no response is required. To the extent a response is required, denied.  Additionally, "the distinction between defamation *per se* and defamation *per quod* is no longer viable" in Tennessee.  *Steele v. Ritz*, 2009 WL 4825183, at \*1, n.2 (Tenn. Ct. App. Dec. 16, 2009)  (citing *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 420 (Tenn. 1978) ("The plaintiff must plead and prove injury from the alleged defamatory words, whether their defamatory meaning be obvious or not."); *Pate v. Service Merchandise Co.*, 959 S.W.2d 569, 573-74 (Tenn. Ct. App. 1997) ("[D]amages must be shown in all defamation cases.")).**

3.      Defendant's conduct constitutes an egregious breach of journalistic standards and a knowing and/or reckless disregard for the truth, necessitating both injunctive relief and significant compensatory and punitive damages to redress the harm caused.

**ANSWER:** These allegations are legal conclusions to which no response is required. To the extent a response is required, denied.

### III.  THE PARTIES

4.  Plaintiff Dr. Farere Dyer, M.D., is a citizen of Tennessee and resides in this District.

**ANSWER:** Admitted only that Plaintiff is a citizen of Tennessee and resides in this District.  Denied that Plaintiff is qualified to practice medicine in Tennessee.

5.  Defendant Scripps is a corporation organized and existing under the laws of Delaware, with its principal place of business located in Cincinnati, Ohio.

**ANSWER:** Admitted.

6.  Scripps conducts substantial business operations within the Middle District of Tennessee and targeted at the Middle District of Tennessee, including operating NewsChannel 5, NewsChannel5.com, and the NewsChannel 5 YouTube channel.

**ANSWER:** Admitted.

7.  Each of NewsChannel 5, NewsChannel5.com, and the NewsChannel 5 YouTube channel has been used by Scripps to publicize defamatory statements that are the subject of this action.

**ANSWER:** These allegations are legal conclusions to which no response is required. To the extent a response is required, denied.

### IV.  JURISDICTION AND VENUE

8.  This Court has subject matter jurisdiction under 28 U.S.C. § 1332 (diversity jurisdiction), as the parties are citizens of different states and the amount in controversy exceeds $75,000.

**ANSWER:** Admitted.

9.     Venue is proper in the Middle District of Tennessee under 28 U.S.C. § 1391, as the defamatory acts giving rise to this action occurred in this District, and Defendant conducts substantial business operations in this District.

**ANSWER:  Admitted only that venue is appropriate in the Middle District of Tennessee.  Denied that there were any "defamatory acts."**

## V.    FACTUAL BACKGROUND

10.     Plaintiff Dr. Farere Dyer holds a Doctor of Medicine (M.D.) degree from St. Christopher Iba Mar Diop College of Medicine ("St. Christopher's"), from which he graduated in 2007.  Dr. Dyer received his academic (didactic) training at the Luton campus of St. Christopher's in Luton, England and his practical rotational training at the Emory University hospital system in Atlanta, GA.  A copy of Dr. Dyer's diploma from St. Christopher's is attached as <u>Exhibit 1</u>.

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.  Defendant further states that as part of its investigation it contacted the Emory University hospital system, which reported no record of Plaintiff ever working or training there.**

11.     Dr. Dyer holds an Associate's Degree in Biology from Boston University and completed post-graduate coursework in Anatomy and Biochemistry at Louisiana State University. Additionally, Dr. Dyer has participated in enrichment programs at Howard University and the Institute for American Universities in France.

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.  Boston University also does not appear to offer an "Associate's Degree," let alone in Biology.**

4

12.     During, and in the year following his graduation from, medical school, Dr. Dyer gained clinical training through a series of rotations.

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

13.     Rotations for medical students and recent graduates are structured periods of clinical training in various medical specialties.  These rotations are a critical component of medical education, allowing students to gain practical, hands-on experience in real-world medical settings under the supervision of licensed physicians.  Each rotation focuses on a specific field, such as Internal Medicine, Pediatrics, or Obstetrics and Gynecology, and provides the student with exposure to the breadth and depth of medical practice.  Through these experiences, students and recent graduates develop essential clinical skills, patient management techniques, and a deeper understanding of specialty-specific knowledge.

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

14.     Dr. Dyer completed multiple core rotations in Internal Medicine under the guidance of Dr. Bamidele Adesunloye and Dr. Jean-Joseph Philippe at Atlanta Medical Center in Atlanta, Georgia.  These rotations focused on patient diagnosis, treatment planning, and chronic disease management.

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

15.     Dr. Dyer trained in Obstetrics and Gynecology under Dr. George Tucker at Atlanta Medical Center.  This rotation involved hands-on experience in prenatal care, labor and delivery, and gynecological procedures.

**ANSWER: Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

16.     Dr. Dyer completed his Pediatrics rotation at Emory Crawford Long Hospital in Atlanta, Georgia, under Dr. Booker Poe.  He gained experience in managing pediatric illnesses, conducting wellness checkups, and supporting developmental care for children.

**ANSWER: Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.  Defendant further states that as part of its investigation it contacted the Emory University hospital system, which reported no record of Plaintiff ever working or training there.**

17.     At Kennestone/Cobb Hospital, Dr. Dyer worked under Dr. James M. Tallman during his Radiology elective.  This rotation provided him with experience in interpreting diagnostic imaging, including X-rays and CT scans.

**ANSWER: Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

18.     Dr. Dyer pursued an elective in Otolaryngology at South Fulton Hospital in Atlanta, Georgia, under Dr. Lisa Perry-Gilkes.  This rotation included training in diagnosing and managing conditions related to the ear, nose, and throat.

**ANSWER: Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

19.     Dr. Dyer trained in Family Medicine at Atlanta Medical Center under Dr. Millard J. Collier, Jr.  This rotation emphasized comprehensive care for patients across all age groups, focusing on preventive health and chronic disease management.

**ANSWER: Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

20. After completing these rotations, Dr. Dyer participated in multiple medical externships.

**ANSWER: Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

21. A medical externship is a structured training experience that allows medical graduates to gain practical, hands-on exposure in clinical environments under the supervision of licensed physicians. These experiences help bridge the gap between academic learning and independent medical practice, equipping participants with essential skills and real-world application of medical knowledge.

**ANSWER: Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

22. Dr. Dyer participated in a series of medical externships that provided hands-on clinical experience and strengthened his practical medical skills.

**ANSWER: Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

23. From May 2010 to May 2012, Dr. Dyer served as a Medical Extern under Dr. Millard D. Collins at Clinica La Paz in Nashville, Tennessee. In this role, Dr. Dyer gained experience in family medicine, focusing on holistic patient care across diverse demographics.

**ANSWER: Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

7

24.     From July 2014 to May 2018, Dr. Dyer worked under Dr. Concepcion G. Martinez at Medicos Nashville Family Medicine, also in Nashville, Tennessee, where he acquired further experience in outpatient care and chronic disease management.

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

25.     From November 2018 to June 2020, Dr. Dyer returned to Clinica La Paz under Dr. Collins, expanding his scope of practice to include comprehensive patient evaluations and care coordination.

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

26.     These externships provided Dr. Dyer with opportunities to apply his medical knowledge in real-world settings while learning under experienced physicians.

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

27.     After graduating from medical school, Dr. Dyer engaged in the Educational Commission for Foreign Medical Graduates (ECFMG) certification process.

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

28.     The ECFMG process evaluates the qualifications of international medical graduates (IMGs).

**ANSWER:  Admitted.**

29.     All international medical graduates from any foreign medical school must go through the ECFMG certification process, regardless of the school from which they graduated.

**ANSWER:** **Admitted.**

30.     Schools must meet ECFMG's requirements for their students and graduates to be eligible to apply for ECFMG certification.

**ANSWER:** **Admitted.**

31.     If a school meets the ECFMG requirements for their students and graduates to be eligible to apply for ECFMG certification, the school will be listed in the ECFMG World Directory.

**ANSWER:** **Denied.  There does not appear to be anything titled the "ECFMG World Directory."  Rather, the ECFMG is one of several *sponsors* of something called the "World Directory of Medical Schools"—which does not contain any listing for St. Christopher's former campus in Luton, England (only the supposed campus in Dakar, Senegal).  Additionally, if a school meets the requirements for students to be eligible for ECFMG certification, the school is listed on the "ECFMG's Medical Schools Eligible for 2025 Pathways (Pathways 2-5)": https://www.ecfmg.org/certification-pathways/pathway-schools/order-by-city.html. St. Christopher's (whether in Senegal or England) does not appear on this list.**

32.     The school from which Dr. Dyer graduated is currently, and was at the time of his graduation, listed in the ECFMG World Directory, and its graduates are therefore eligible for ECFMG certification.

**ANSWER:** **Denied.  There does not appear to be anything titled the "ECFMG World Directory."  Rather, the ECFMG is one of several *sponsors* of something called the "World Directory of Medical Schools"—which does not contain any listing for St. Christopher's former campus in Luton, England (only the supposed campus in**

Dakar, Senegal). Additionally, if a school meets the requirements for students to be eligible for ECFMG certification, the school is listed on the "ECFMG's Medical Schools Eligible for 2025 Pathways (Pathways 2-5)": https://www.ecfmg.org/certification-pathways/pathway-schools/order-by-city.html. St. Christopher's (whether in Senegal or England) does not appear on this list.

33. The process for ECFMG certification includes:

- Application: Applicants submit an online application and a notarized Certification of Identification Form (Form 186);

- Medical school verification: ECFMG verifies the applicant's medical school status;

- USMLE exam: Applicants must pass Steps 1 and 2 Clinical Knowledge (CK) of the United States Medical Licensing Examination (USMLE);

- Communication skills: Applicants must pass the Occupational English Test (OET) Medicine;

- Credential verification: ECFMG reviews the applicant's medical school credentials and compares them to sample documents;

- Communication with medical school: ECFMG may contact the applicant's medical school to request verification of the credentials; and

- Notification: Applicants are notified online when they have been certified.

**ANSWER: Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

34. The ECFMG is the only body with nationwide authority to determine whether a foreign medical school meets the requirements for its graduates to pursue a medical license in the United States.

**ANSWER: Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

35.     The ECFMG is the only body with nationwide authority to certify whether an international medical school graduate has met the requirements to pursue a medical license in the United States.

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

36.     The ECFMG determined that the medical school from which Dr. Dyer graduated met the requirements for its graduates to pursue a medical license in the United States.

**ANSWER:  Denied.  If a school meets the requirements for students to be eligible for ECFMG certification, the school is listed on the "ECFMG's Medical Schools Eligible for 2025 Pathways (Pathways 2-5)":  https://www.ecfmg.org/certification-pathways/pathway-schools/order-by-city.html.  St. Christopher's (whether in Senegal or England) does not appear on this list.**

37.     The ECFMG certified that Dr. Dyer met the requirements to pursue a medical license in the United States.

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

38.     Dr. Dyer undertook at least one component of the USMLE each year from 2008 to 2018.

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

39.     Dr. Dyer has passed Step 1 and Step 2 of the USMLE.

**ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them. Defendant further states that Dr. Vasquez' attorney stated that Plaintiff "couldn't pass part" of the USMLE.**

40.     From March 2020 until March 2024, Dr. Dyer was employed at the Center for Reproductive Health (CRH).

**ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

41.     Dr. Dyer's employment at CRH was under the supervision of Dr. Jaime Vasquez, a licensed Tennessee physician.

**ANSWER:** **Denied. Numerous former CRH patients Defendant spoke with never saw or had any contact with Dr. Vasquez whatsoever. Numerous former CRH patients Defendant spoke with also stated they had no idea who Dr. Vasquez even was until they realized he had written their prescriptions. Indeed, no former CRH patient Defendant spoke with ever believed they were a patient of Dr. Vasquez.**

42.     CRH was a reproductive healthcare clinic specializing in fertility treatments, including in vitro fertilization (IVF), intrauterine insemination (IUI), egg preservation, and hormonal therapy. The clinic also offered comprehensive reproductive endocrinology services and patient counseling, providing individualized care to patients seeking assistance with family planning and fertility challenges.

**ANSWER:** **Admitted.**

43.     IUIs involve placing sperm directly into a woman's uterus using a catheter.

**ANSWER:** **Admitted.**

44.     Under Tennessee law and standard medical practices, IUIs can be performed by individuals without medical licenses who are operating under the supervision of a licensed physician, including nurses.

**ANSWER: Denied.  The Tennessee Board of Medical Examiners "Policy Statement: Delegation of Medical Services" states that a delegating physician may not delegate "acts which are exclusively limited to an individual who must be licensed, certified, registered or otherwise credentialed unless the individual is so qualified."  This Policy Statement goes on to state:**

> **[A] delegated tasks must be of the type that a reasonably prudent physician would find within the scope of sound medical judgment to delegate, i.e., routine, technical services, the performance of which do not require the special skills of a licensed physician.  Those services which are routine and technical in nature shall include but not be limited to:  taking vital signs, taking histories, assisting in minor procedures, answering patient calls, etc.  Employees who are licensed as healthcare professionals may perform routine, technical services and clinical tasks which fall within the scope of their authorized practice.**

45.     Dr. Dyer was appropriately authorized to, and did, perform intrauterine insemination (IUI) procedures while employed at CRH.

**ANSWER:  Admitted that Plaintiff performed IUIs at CRH but denied that he was "appropriately authorized" for such procedures.**

46.     Dr. Dyer also engaged in non-procedural tasks such as educating new patients about treatment options, overseeing the collection of diagnostic information through ultrasounds and hormone level lab tests, and discussing the results of these tests with patients to provide clear and informed guidance.

**ANSWER:  Admitted.**

47.     All these tasks were conducted within the bounds of Dr. Dyer's role as an employee supervised by Dr. Vasquez and in adherence to Tennessee medical regulations.

**ANSWER:  Denied.  Numerous former CRH patients Defendant spoke with never saw or had any contact with Dr. Vasquez whatsoever.  Numerous former CRH patients Defendant spoke with also stated they had no idea who Dr. Vasquez even was until they realized he had written their prescriptions.  Indeed, no former CRH patient Defendant spoke with ever believed they were a patient of Dr. Vasquez.**

48.     Dr. Dyer did not perform any procedures at CRH that are required to be performed by a licensed medical doctor.

**ANSWER:  Denied.**

49.     Dr. Dyer did not perform egg retrievals.

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

50.     Dr. Dyer did not perform in vitro fertilization (IVF).

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

51.     Dr. Dyer did not practice anesthesiology or administer general anesthesia to any patient.

**ANSWER:  Denied.**

52.     Dr. Dyer was not responsible for choosing or developing treatment plans at CRH.

**ANSWER:  Denied.  Multiple former CRH patients told Defendant that Plaintiff never indicated he was working in consultation with Dr. Vasquez or that Dr. Vasquez was reviewing their charts and coming up with treatment plans.  Rather, these former**

**CRH patients were under the impression Plaintiff was their physician—often based on Plaintiff's own explanations or statements as treatments were discussed. Additionally, when these former CRH patients would call CRH with an issue, nurses' and other staff's notations listed a consultation "with Dr. Dyer" about how to handle the patient's concern. Numerous former CRH Defendant spoke with patients never saw or had any contact with Dr. Vasquez whatsoever. Numerous former CRH patients Defendant spoke with also stated they had no idea who Dr. Vasquez even was until they realized he had written their prescriptions. Indeed, no former CRH patient Defendant spoke with ever believed they were a patient of Dr. Vasquez.**

53.    In its November 2024 letter to patients of CRH, the Tennessee Department of Health ("DoH") confirmed that Dr. Dyer's actions at CRH did not constitute unauthorized practice of medicine.

**ANSWER:    Denied. This letter (which Plaintiff notably did not attach to his Complaint) stated only "that *there was not sufficient evidence* to conclude that Farere Dyer practiced medicine in Tennessee without a license." (emphasis added). Finding of a lack of sufficient evidence is not the same as "confirm[ing] that Dr. Dyer's actions at CRH did not constitute unauthorized practice of medicine."**

54.    When introducing himself to CRH patients, Dr. Dyer would generally make a statement to the effect that his name was Farere Dyer, that most people call him Dr. Dyer, and that he was Dr. Vasquez's "fellow" or "extern."

**ANSWER:    Denied. Multiple former CRH patients told Defendant that Plaintiff never indicated he was working in consultation with Dr. Vasquez or that Dr. Vasquez was reviewing their charts and coming up with treatment plans. Rather, these former**

CRH patients were under the impression Plaintiff was their physician—often based on Plaintiff's own explanations or statements as treatments were discussed. Additionally, when these former CRH patients would call CRH with an issue, nurses and other staff's notations listed a consultation "with Dr. Dyer" about how to handle the patient's concern. Numerous former CRH patients Defendant spoke with never saw or had any contact with Dr. Vasquez whatsoever. Numerous former CRH patients Defendant spoke with also stated they had no idea who Dr. Vasquez even was until they realized he had written their prescriptions. Indeed, no former CRH patient Defendant spoke with ever believed they were a patient of Dr. Vasquez. *See also* AMA Guideline H-405-951(5) ("Policy requires any individual who has direct patient contact and presents to the patient as a doctor, and who is not a physician, as defined above, must specifically and simultaneously declare themselves a non-physician and define the nature of their doctorate degree."). Defendant further states that medical "fellows" must be licensed under Tennessee law and the Tennessee Board of Medical Examiners ("BME") had no record of Plaintiff ever obtaining such license.

55. Dr. Dyer's white lab coat included the word "Fellow" beneath his name.

**ANSWER:** Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them. Defendant further states that medical "fellows" must be licensed under Tennessee law and the Tennessee Board of Medical Examiners ("BME") had no record of Plaintiff ever obtaining such license.

56. Dr. Dyer's name was not listed on the sign at the CRH entrance, which listed Dr. Vasquez and no other names.

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.  Additionally, CRH's Facebook and Instagram pages contained multiple posts about "Dr. Dyer," and CRH's own printed procedure forms listed Plaintiff as "Dr. Dyer."  Indeed, no former CRH patient Defendant ever spoke with ever believed they were a patient of Dr. Vasquez.**

57.     To formalize a medical fellowship for review by licensing authorities such as the Tennessee BME, the sponsoring physician must sign and file certain paperwork setting forth the fellowship specifications with an academic institution with which the fellowship is affiliated.  In November of 2023, after Dr. Dyer had already spent nearly four years working as Dr. Vasquez's fellow, Dr. Vasquez told Dr. Dyer that he would not sign the final paperwork formalizing Dr. Dyer's fellowship for review by licensing boards.

**ANSWER:  The first sentence of this Paragraph contains legal conclusions to which no response is required.  To the extent a response is required to the first sentence, denied.  Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in the second sentence of this Paragraph and therefore denies them.**

58.     Dr. Dyer submitted a letter resigning his position on January 30, 2024, with his resignation effective March 8, 2024.

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

59.     CRH closed in early April 2024, after Dr. Dyer had left employment there.  On information and belief, the closure was due to financial difficulties.

**ANSWER:  Admitted.**

60.     On April 8, 2024, NewsChannel 5 broadcast and published stories regarding the closure of CRH.

**ANSWER:  Admitted.**

61.     In April 2024, an employee of NewsChannel 5, reporter Jennifer Kraus, contacted Dr. Dyer requesting an interview.

**ANSWER:  Admitted.**

62.     In a short phone call, Dr. Dyer provided some information to Ms. Kraus, including that he served as Dr. Vasquez's extern/fellow and conducted patient education.

**ANSWER:  Denied.  During this approximately 1-hour telephone call, it was difficult for Defendant to pin down Plaintiff's education and qualifications.  Plaintiff refused to provide a copy of his diploma and/or transcripts despite repeated requests. Plaintiff also initially stated he attended medical school at St. Christohper's in Massachusetts, which later changed to London, and then Eton (outside of London). Plaintiff also claimed not to know about the revocation of St. Christopher's accreditation in 2006 (a year before his alleged graduation) even though that event was widely covered by the BBC.  And when asked where he performed his residency and internship, Plaintiff claimed Emory University and further graduate work at Meharry Medical—but both later stated they had no record of Plaintiff ever working there.**

63.     Ms. Kraus asked for further information and a full interview from Dr. Dyer. Although initially open to the idea, Dr. Dyer ended up declining to provide Ms. Kraus an interview and decided to provide Ms. Kraus no further information.

**ANSWER:  Admitted.**

18

64.     After Dr. Dyer informed Ms. Kraus that he did not feel comfortable providing an interview or further information, Ms. Kraus continued to contact Dr. Dyer and became increasingly hostile when Dr. Dyer did not respond.

**ANSWER:  Denied.**

65.     On May 2, 2024, Ms. Kraus came without permission to Dr. Dyer's personal residence with a NewsChannel 5 van and appeared to be filming a story.  Dr. Dyer called the police, citing his concerns relating to privacy for his family.  A true and correct copy of the police report relating to this incident is attached as Exhibit 2.

**ANSWER:  Admitted that Ms. Kraus came to Plaintiff's residence on or around May 2, 2024, but denied that her "permission" was required as she stayed in the public street after knocking on his door.  Defendant is without knowledge or information sufficient to form a belief as to the allegations contained in the second sentence of this Paragraph and therefore denies them.**

66.     On May 6, 2024, Defendant published and broadcast stories including numerous false and defamatory statements pertaining to Dr. Dyer.

**ANSWER:  Admitted that on May 6, 2024, Defendant published and broadcast stories that contained statements pertaining to Plaintiff, but denied that those statements were false, defamatory, or actionable in any way.**

67.     Defendant's YouTube posting of this broadcast is entitled in part, "[h]e wasn't even a doctor" referring to Dr. Dyer.  A true and correct screenshot of Defendant's YouTube posting of the May 6, 2024 broadcast is attached as Exhibit 3.

**ANSWER:  Admitted, although the full title reads:  "She thought she was being treated by a fertility specialist.  He wasn't even a doctor."**

19

68.     The May 6, 2024 broadcast and accompanying article claimed that Dr. Dyer was "not" "a doctor." A true and correct copy of the May 6, 2024 article is attached as Exhibit 4.

**ANSWER:  Admitted, although the full quotation reads:  "Why did the man who treated so many of these women hold himself out to be a doctor when he is not?"**

69.     This broadcast included the question, "Why did the man who treated so many women hold himself out to be a doctor when, believe it or not, he is not?", referring to Dr. Dyer.

**ANSWER:  Admitted.**

70.     Defendant's assertion that Dr. Dyer "wasn't even a doctor" was false.

**ANSWER:  Denied.  This statement is 100% true.**

71.     Dr. Dyer holds an M.D. degree from St. Christopher Iba Mar Diop College of Medicine.

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

72.     As a holder of an M.D. degree, Dr. Dyer is entitled to use the title "doctor" in accordance with American Medical Association (AMA) guidelines.

**ANSWER:   Denied.  AMA Guideline 405.951 states that the synonymous term "physician" is limited to those who both have a medical degree <u>and</u> be eligible for an Accreditation Council for Graduate Medical Education ("ACGME") residency.  And to be eligible for an ACGME residency, graduates of foreign medical schools must either hold a valid ECFMG certificate or valid medical license.  Because Plaintiff has neither a valid ECFMG certificate or valid medical license, he is not eligible for an ACGME residency and cannot call himself a "physician" under the AMA Guidelines. *See also* AMA Guideline H-405-951(5) ("Policy requires any individual who has direct**

patient contact and presents to the patient as a doctor, and who is not a physician, as defined above, must specifically and simultaneously declare themselves a non-physician and define the nature of their doctorate degree.").

73. Defendant's broadcast and story implied that Dr. Dyer "h[e]ld himself out to be a doctor" deceitfully.

**ANSWER: These allegations are legal conclusions to which no response is required. To the extent a response is required, denied.**

74. This implication is also false. Dr. Dyer is a doctor and was transparent with patients about his role under Dr. Vasquez's supervision.

**ANSWER: Denied.**

75. Defendant's reports failed to clarify that Dr. Dyer performed only tasks permitted under Tennessee law, including intrauterine inseminations (IUIs) and patient education, all of which were conducted under Dr. Vasquez's appropriately delegated authority and oversight. Defendant created the false impression that Dr. Dyer was acting improperly or illegally.

**ANSWER: Denied.**

76. Defendant's misrepresentations in the May 6, 2024 broadcast and article were not only false and misleading but also recklessly ignored easily available evidence verifying Dr. Dyer's qualifications and authorization to perform the procedures he performed.

**ANSWER: Denied. Plaintiff refused to provide a copy of his diploma and/or transcripts despite repeated requests.**

77. In the May 6, 2024 broadcast, Ms. Kraus additionally stated that "we found degrees from the medical school he claims he graduated from in England in 2008, St. Christopher's College

of Medicine, are not recognized or accepted for licensure in either Britain or many states in the

U.S., including apparently Tennessee."

**ANSWER:** **Admitted.**

78.     In fact, Tennessee permits graduates of St. Christopher's to obtain licensure through

the standard process for international medical school graduates.

**ANSWER:** **Denied. If a school meets the requirements for students to be eligible for**

**ECFMG certification, the school is listed on the "ECFMG's Medical Schools Eligible**

**for 2025 Pathways (Pathways 2-5)":** https://www.ecfmg.org/certification-

pathways/pathway-schools/order-by-city.html**. St. Christopher's (whether in Senegal**

**or England) does not appear on this list.**

79.     Information regarding the ECFMG process outlined above is easily available via a

basic Google search.

**ANSWER:** **Admitted.**

80.     The status on the World Directory of the medical school from which Dr. Dyer

graduated is also easily available via a basic internet search.

**ANSWER:** **Denied. The "World Directory of Medical Schools" does not contain any**

**listing for St. Christopher's former campus in Luton, England (only the supposed**

**campus in Dakar, Senegal). Additionally, if a school meets the requirements for**

**students to be eligible for ECFMG certification, the school is listed on the "ECFMG's**

**Medical Schools Eligible for 2025 Pathways (Pathways 2-5)":**

https://www.ecfmg.org/certification-pathways/pathway-schools/order-by-city.html**.**

**St. Christopher's (whether in Senegal or England) does not appear on this list.**

81.     Defendant's statement created the false inference that St. Christopher's was uniquely inadequate or disqualifying for Tennessee licensure, which is not the case.

**ANSWER:  These allegations are legal conclusions to which no response is required. To the extent a response is required, denied.**

82.     No foreign medical school is directly accepted for licensure in the United States, and graduates of all foreign medical schools must complete additional steps, such as the ECFMG certification process and USMLE.

**ANSWER:  Admitted.**

83.     Defendant's implication that Dr. Dyer's medical education was inferior unfairly cast his credentials in a false light.

**ANSWER:  These allegations are legal conclusions to which no response is required. To the extent a response is required, denied.**

84.     Prior to NewsChannel 5's reporting on CRH, Dr. Dyer was known professionally within his role as a medical fellow under Dr. Vasquez's supervision at CRH but had not sought public attention or engaged in matters of public controversy.  Dr. Dyer's professional activities were confined to his employment at CRH, and he had no prior media exposure or involvement in public-facing disputes.  As such, any public attention he received arose solely from Defendant's reporting, which catapulted his name into public discourse and falsely characterized his professional role.

**ANSWER:  Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.  Defendant further states that medical "fellows" must be licensed under Tennessee law and the Tennessee Board of Medical Examiners ("BME") had no record of Plaintiff ever obtaining such license.**

85.    On May 10, 2024, Defendant published and broadcast stories including numerous false and defamatory statements pertaining to Dr. Dyer.  A true and correct copy of the May 10, 2024 article is attached as Exhibit 5.

**ANSWER:  Admitted that on May 10, 2024, Defendant published and broadcast stories that contained statements pertaining to Plaintiff, but denied that those statements were false, defamatory, or actionable in any way.**

86.    Defendant claimed that Dr. Dyer "claimed to be their doctor" referring to patients of CRH.

**ANSWER:  Admitted, although the full quotation reads as follows:  "The women who have filed complaints with police believed the man who claimed to be their doctor was a licensed medical professional."**

87.    Defendant's broadcast included the statement, "You have to be licensed by the state of Tennessee to do a procedure, and from our initial investigation, there were procedures being done that would require a licensed physician."

**ANSWER:  Admitted that Defendant's May 10, 2024, broadcast included this quotation from Nashville Police Department Captain Johnnie Melzoni.**

88.    This statement suggested that Dr. Dyer performed medical procedures that required a medical license and thus implied that such actions were unlawful.

**ANSWER:  These allegations are legal conclusions to which no response is required. To the extent a response is required, denied.**

89.    This statement was false and misleading.  Dr. Dyer only performed tasks as allowed under Tennessee BME regulations.  These tasks included intrauterine inseminations (IUIs), which

are lawful to be performed by a person without a medical license under the supervision of a licensed physician.

      **ANSWER:** **The first sentence of this Paragraph contains legal conclusions to which no response is required. To the extent a response is required to the first sentence, denied. Defendant denies the allegations in the second sentence of this Paragraph. The Tennessee Board of Medical Examiners "Policy Statement: Delegation of Medical Services" states that a delegating physician may not delegate "acts which are exclusively limited to an individual who must be licensed, certified, registered or otherwise credentialed unless the individual is so qualified." This Policy Statement goes on to state:**

> **[A] delegated tasks must be of the type that a reasonably prudent physician would find within the scope of sound medical judgment to delegate, i.e., routine, technical services, the performance of which do not require the special skills of a licensed physician. Those services which are routine and technical in nature shall include but not be limited to: taking vital signs, taking histories, assisting in minor procedures, answering patient calls, etc. Employees who are licensed as healthcare professionals may perform routine, technical services and clinical tasks which fall within the scope of their authorized practice.**

90.     The May 10, 2024 article stated, "Metro police then set up a special email box so women who'd been patients at the clinic, especially Farere Dyer's could contact them. . . . And less than 48 hours later after that email address had been set up, police had already heard from 46 women."

      **ANSWER:** **Admitted, although the full quotation reads: "Metro police then set up a special email box so women who'd been patients at the clinic, *especially Farere Dyer's* could contact them. That email address is CRHcomplaint@nashville.gov. And less**

**than 48 hours later after that email address had been set up, police had already heard from 46 women."** (emphasis added).

91.     The May 10, 2024 article further stated, "Some of these cases are going to have criminal consequences."

**ANSWER:   Admitted that Defendant's May 10, 2024, broadcast included this quotation from Nashville Police Department Captain Johnnie Melzoni.  The full quotation states as follows:  "Some of these cases are going to have criminal consequences.  And we want to talk to everyone about their experience so we can find out exactly what happened."**

92.     The reference to "some of these cases" in the May 10, 2024 article pertained to investigations resulting from outreach to the Nashville police department regarding CRH at the "special email box."

**ANSWER:  Admitted.**

93.     The May 10, 2024 article created the false impression that Dr. Dyer had engaged in criminal activity.

**ANSWER:  These allegations are legal conclusions to which no response is required. To the extent a response is required, denied.**

94.     These statements from the May 10, 2024 broadcast and accompanying article were false, misleading, and damaging to Dr. Dyer's reputation.

**ANSWER:  These allegations are legal conclusions to which no response is required. To the extent a response is required, denied.**

95.    On May 29, 2024, Defendant published and broadcast additional false and defamatory statements about Dr. Dyer, mischaracterizing his professional conduct and role at CRH.

**ANSWER:  Admitted that on May 29, 2024, Defendant published and broadcast stories that contained statements pertaining to Plaintiff, but denied that those statements were false, defamatory, or actionable in any way.**

96.    The May 29, 2024 broadcast stated, "The man they thought was a doctor, who had performed procedures on them, wasn't who he'd claimed to be."

**ANSWER:  Admitted, although the full quotation reads as follows:  "But these women had no idea until they saw our reporting that Farere Dyer, the man they thought was a doctor, who had performed procedures on them, wasn't who he'd claimed to be."**

97.    This was false as Dr. Dyer holds a valid M.D. degree and did not claim to be a licensed doctor.

**ANSWER:  Denied.**

98.    In the May 29, 2024 broadcast, Defendant aired a patient's statement, "Dr. Dyer slept me for my first IVF egg removal so that's like invasive and what not in and of itself and putting catheters in and putting someone under."

**ANSWER:  Admitted.**

99.    In the accompanying May 29, 2024 article, Defendant paraphrases this statement as "Dr. Dyer (put me to sleep) for my first IVF egg removal so that's like invasive and what not in and of itself and putting catheters in and putting someone under."  A true and correct copy of the May 29, 2024 article is attached as Exhibit 6.

**ANSWER:  Admitted.**

100.    Defendant further stated in the May 29, 2024 article, "While we knew that Dyer had performed a number of less invasive intrauterine inseminations or IUIs, we learned here, according to his patients, that he also did more complex procedures as well."

**ANSWER: Admitted.**

101.    These statements indicate that Dr. Dyer practiced anesthesiology.

**ANSWER: These allegations are legal conclusions to which no response is required. To the extent a response is required, denied.**

102.    These statements were false and misleading because Dr. Dyer did not practice anesthesiology.

**ANSWER: These allegations are legal conclusions to which no response is required. To the extent a response is required, denied.**

103.    These statements indicate that Dr. Dyer performed invasive procedures.

**ANSWER: These allegations are legal conclusions to which no response is required. To the extent a response is required, denied.**

104.    These statements were false and misleading because Dr. Dyer did not perform invasive procedures.

**ANSWER: These allegations are legal conclusions to which no response is required. To the extent a response is required, denied.**

105.    On August 30, 2024, Defendant published and broadcast further false and defamatory statements about Dr. Dyer, continuing to misrepresent his role and actions at CRH.  A true and correct copy of the August 30, 2024 article is attached as Exhibit 7.

**ANSWER: Admitted that on August 30, 2024, Defendant published and broadcast stories that contained statements pertaining to Plaintiff, but denied that those statements were false, defamatory, or actionable in any way.**

106. The August 30, 2024 broadcast stated, "We exposed he was treating patients at the fertility clinic," referring to Dr. Dyer.

**ANSWER: Admitted, although the full quotation reads as follows: "We exposed he was treating patients at the fertility clinic, but he is not a licensed medical doctor."**

107. "Treating" a patient as a doctor means to provide medical care and management to a patient by actively assessing their health condition, diagnosing any illnesses or injuries, formulating a treatment plan, and implementing that plan through interventions like medication, surgery, or other therapeutic measures.

**ANSWER: These allegations are legal conclusions to which no response is required. To the extent a response is required, denied.**

108. Dr. Dyer did not treat patients; rather, Dr. Dyer—along with the other employees at CRH—helped to implement treatment plans under Dr. Vasquez's supervision that were created and chosen by Dr. Vasquez.

**ANSWER: Denied.**

109. On September 5, 2024, Defendant published and broadcast additional false and defamatory statements about Dr. Dyer, misrepresenting his actions and role at CRH.

**ANSWER: Admitted that on September 5, 2024, Defendant published and broadcast stories that contained statements pertaining to Plaintiff, but denied that those statements were false, defamatory, or actionable in any way.**

110.    The title of Defendant's September 5, 2024 article is "Fertility clinic patients angry over DA's decision not to charge man who treated them but was not a doctor."  A true and correct copy of the September 5, 2024 article is attached as Exhibit 8.

**ANSWER:  Admitted.**

111.    The September 5, 2024 article states, "Dyer is not a doctor and he has never had a license to practice medicine."

**ANSWER:  Admitted.**

112.    The September 5, 2024 article further states, "Dyer . . . was seeing patients at the fertility clinic, performing invasive procedures and touching women as only their doctor might. And his patients believed he was a doctor."

**ANSWER:  Admitted, although the full quotation reads as follows:  "Dyer, if you recall, was seeing patients at the fertility clinic, performing invasive procedures and touching women as only their doctor might.  And his patients believed he was a doctor. And why not?"**

113.    The September 5, 2024 broadcast and article also include the language "what Dyer had done appeared to be sexual assault."

**ANSWER:  Admitted, although the full quotation reads as follows:**

**"You have to be licensed by the state of Tennessee to do a procedure and our initial investigation, there were procedures being done that would require a licensed physician," Metro Police Captain Johnnie Melzoni explained back in May after our initial reporting.**

**Melzoni heads up the department's Special Victims Division and told us what Dyer had done appeared to be sexual assault.**

**"So you're calling these women, these patients, victims?" we asked him.**

**"Absolutely.  Absolutely," Melzoni replied.**

114.    The September 5, 2024 broadcast also displays a letter from the office of DA Glenn Funk, entitled "Re:  Decision Not to Prosecute in the Case of Dr. Farere Dyer and the Center for Reproductive Health."

**ANSWER:  Admitted.**

115.    The September 5, 2024 broadcast and article state that, "according to the DA's letter, the facts in this case do not meet the legal requirements to pursue rape by fraud charges because there's not enough evidence to pursue the charge."

**ANSWER:  Admitted.**

116.    The text of the DA's letter includes the following:  "After a thorough review of the allegations against Dr. Farere Dyer and the Center for Reproductive Health, our office has determined that the facts of the case do not meet the legal requirements necessary to pursue a criminal prosecution for rape by fraud under Tennessee law. . . .In Tennessee, the charge of rape by fraud is narrowly defined and requires the fraudulent act to . . . relate to the nature of the sexual act itself."

**ANSWER:  Admitted, although the full text of this letter is as follows:**

> **After a thorough review of the allegations against Dr. Farere Dyer and the Center for Reproductive Health, our office has determined that the facts of the case do not meet the legal requirements necessary to pursue a criminal prosecution for rape by fraud under Tennessee law.**

> **We want to acknowledge the profound distress and pain experienced by those affected by the actions of the clinic.  Our decision not to prosecute should not be interpreted as a dismissal of the suffering endured by the patients involved.  Instead, it reflects the specific legal standards we must adhere to when considering charges of this nature.**

In Tennessee, the charge of rape by fraud is narrowly defined and requires the fraudulent act to directly relate to the nature of the sexual act itself. In this case, while there may have been significant breaches of trust and ethical standards, these do not meet the stringent criteria set forth by our state's legal precedent, specifically as established in the *State v. Mitchell* case.

We want to assure you that this decision does not close the door on all potential legal consequences. The Tennessee Attorney General's Office is currently pursuing a lawsuit against Dr. Vasquez and the Center for Reproductive Health under the Tennessee Consumer Protection Act. Additionally, the U.S. Attorney's Office for the Middle District of Tennessee is actively investigating the fraud aspects of this case. If new evidence comes to light that alters the legal landscape, we will reassess our decision accordingly.

We extend our deepest sympathies to the victims and encourage anyone affected to seek support and explore other legal remedies available to them.

117.    The DA's letter also states, regarding certain facts of the case, that "these do not meet the stringent criteria set forth by our state's legal precedent, specifically as established in the *State v. Mitchell* case."

**ANSWER:  Admitted, although the full text of this letter is reiterated above.**

118.    Defendant mischaracterized the letter as indicating there was "not enough evidence to pursue the charge," when, in fact, the District Attorney had affirmatively determined that the legal elements required to prosecute the alleged crime were not met. By selectively presenting the facts and falsely implying that Dr. Dyer avoided prosecution due to insufficient evidence, Defendant misled the public, perpetuating a defamatory and highly damaging narrative that falsely imputed criminal conduct to Dr. Dyer.

**ANSWER:  Denied.  These allegations also contain legal conclusions to which no response is required.  To the extent a response is required, denied.**

119.    In the September 5, 2024 broadcast and article, Defendant aired and published a statement claiming, "To me, if you would say you are a physician and you are not, then you're an imposter.  That's criminal."

**ANSWER:  Admitted.**

120.    Defendant's September 5, 2024 broadcast and article included the statement, regarding Dr. Dyer, that he "knew . . . every day when he put that coat on" that he was not "licensed to do any of it."

**ANSWER:  Admitted, although the full quotation reads as follows:**

> **"Dyer was not licensed to do this and he knew that every day when he put that coat on.  And every single time he sat down at a desk and looked at a family in the eye who is suffering and in pain from infertility and said, 'I can get you pregnant.'  He knew that.  He knew he couldn't.  He knew he wasn't licensed to do any of it, and he knew he didn't know what he was talking about, but he did it anyway," [Sarah] Davis said.**

121.    On October 21, 2024, Defendant published and broadcast additional false and defamatory statements about Dr. Dyer, continuing to misrepresent his actions and role at CRH.  A true and correct copy of the October 21, 2024 article is attached as Exhibit 9.

**ANSWER:  Admitted that on October 21, 2024, Defendant published and broadcast stories that contained statements pertaining to Plaintiff, but denied that those statements were false, defamatory, or actionable in any way.**

122.    Defendant's October 21, 2024 broadcast claimed that Dr. Dyer "developed patient treatment plans" and "came up with fertility drug prescriptions."

**ANSWER:  Denied.  This News Story stated as follows:**

> **"How many IUIs did you have there?" we had asked [Sarah] Davis.**

> **"Two."**

> "And who performed them?" we asked.
>
> "Both of them were Dr. Dyer," Davis told us.
>
> Davis said Dyer analyzed her ultrasounds and labwork and came up with her treatment plan, including she says the fertility drugs she would take. But she showed us her prescription bottles and Dyer's name was not on any of them.
>
> "Everything says Dr. Vasquez, Jamie Vasquez MD," she showed us.
>
> And how many times did you see Dr. Vasquez?" we wondered.
>
> "Never," Davis replied.

123.    All treatment plans and prescriptions at CRH were developed, selected, and approved solely by Dr. Jaime Vasquez, the supervising physician.

**ANSWER:** **Denied.** a

124.    Dr. Dyer's role with respect to treatment plans was limited to collecting and reviewing diagnostic and patient biographical information, recommending which of Dr. Vasquez's pre-developed treatment plans may be best, for Dr. Vasquez's decision and approval, and assisting with routine implementation of the treatment plan that Dr. Vasquez chose.

**ANSWER:** **Denied.**

125.    On November 12, 2024, at approximately 1:00 PM, Dr. Dyer became aware that Defendant intended to broadcast an additional story about him on the evening news that day.

**ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

126.    Before 3 PM on November 12, 2024, counsel for Dr. Dyer notified Defendant and Defendant's counsel that Defendant's reporting regarding Dr. Dyer had included numerous false

and defamatory statements, such as that Dr. Dyer was "not a doctor", and that any further reporting repeating these statements would be defamatory as well.

**ANSWER:** **Admitted.**

127. Counsel for Defendant replied that afternoon, stating in part that "NewsChannel 5 is not aware of any false and defamatory statements" in the story it planned to air regarding Dr. Dyer.

**ANSWER:** **Admitted.**

128. At the time Defendant's counsel sent its response, Defendant was in possession of a letter sent to a CRH patient by the Director of the Office of Investigations of the Tennessee Department of Health (the "DoH Closure Letter"), stating that the "complaint against Farere Dyer has been closed due to lack of evidence of a practice act violation" and that "there was not sufficient evidence to conclude that Farere Dyer practiced medicine in Tennessee without a license."

**ANSWER:** **Admitted only that Defendant was in possession of this letter, but denied that the letter "closed" all investigations into Plaintiff.**

129. Prior to the evening of November 12, 2024, Defendant had been notified that its upcoming broadcast would include defamatory statements regarding Dr. Dyer.

**ANSWER:** **Admitted only that Plaintiff's counsel made these allegations.**

130. Defendant nonetheless broadcast and published additional false and defamatory statements about Dr. Dyer, further misrepresenting his role at CRH and his professional conduct. A true and correct copy of the November 12, 2024 article is attached as Exhibit 10.

**ANSWER:** **Admitted that on November 12, 2024, Defendant published and broadcast stories that contained statements pertaining to Plaintiff, but denied that those statements were false, defamatory, or actionable in any way.**

131.    Defendant's November 12, 2024 broadcast declared in reference to Dyer, "Women thought he was a doctor, but that wasn't the case at all.  He wasn't a doctor and didn't have a license to practice medicine."

**ANSWER:** **Denied.  This broadcast contained the following statement:  "Women thought he was a doctor who thought he was going to treat their infertility issues and help them get pregnant.  But a NewsChannel5 investigation exposed that wasn't the case at all.  He wasn't a doctor and didn't have a license to practice medicine."**

132.    A reasonable hearer of this statement would understand it to mean that Dr. Dyer did not possess an M.D. degree, as the use of "at all" and distinction between being "a doctor" and "hav[ing] a license to practice medicine" would reasonably cause viewers to understand the statement as pertaining to Dr. Dyer's academic qualifications and not just his licensure status.

**ANSWER:** **These allegations are legal conclusions to which no response is required.  To the extent a response is required, denied.**

133.    Defendant's November 12, 2024 broadcast stated that Dr. Dyer was "knowingly treating these patients without a license."

**ANSWER:** **Admitted, although the full quotation reads as follows:  "'At what point is Dyer going to be held responsible for what he did?  His role you know of knowingly treating these patients without a license?  Where is that responsibility?' [Lauren] Miller asked."**

134.    Defendant's November 12, 2024 article states that "sources tell us the reason charges were never filed was that the Tennessee Department of Health told DA Glenn Funk to drop the case."

**ANSWER:  Admitted, although the full quotation reads as follows:  "As we have reported, the Davidson County District Attorney's Office was considering criminal charges against Dyer for his actions, but sources tell us the reason charges were never filed was that the Tennessee Department of Health told DA Glenn Funk to drop the case."**

135.    Defendant had previously reported a different reason charges were not brought by the DA's office, which Defendant articulated as "not enough evidence to pursue the charge" in its September 5, 2024 article.  Defendant thus knew that its reporting was false.

**ANSWER:  Admitted that Defendant's September 5, 2024, News Story stated that: "according to the DA's letter, the facts in this case do not meet the legal requirements to pursue rape by fraud charges because there's not enough evidence to pursue the charge."  Denied that means or implies Defendant knew its reporting was false when a source later said charges were never filed because the Tennessee Department of Health told DA Glenn Funk to drop the case.**

136.    Defendant's November 12, 2024 broadcast included excerpts from prior broadcasts about Dr. Dyer, including the allegation from the May 29, 2024 broadcast that Dr. Dyer practiced anesthesiology in the context of an IVF egg retrieval.

**ANSWER:  Admitted.**

137.    Defendant's November 12, 2024 written article included the allegation that Dr. Dyer practiced anesthesiology in the context of an IVF egg retrieval.

**ANSWER: Admitted only that Defendant's November 12, 2024, article contained the following quotation from a former CRH patient: "Dr. Dyer 'slept' me for my first IVF egg removal so that's like invasive and whatnot in its own self, and putting catheters in and putting someone under."**

138. At the time of Defendant's November 12, 2024 broadcast, Defendant was in possession of the DoH Closure Letter.

**ANSWER: Admitted that Defendant had this letter at the time of its November 12, 2024, broadcast, but denied that the letter was a "closure letter."**

139. The November 12, 2024 broadcast and accompanying written article included multiple allegations that were directly contradicted by the DoH Closure Letter. Defendant knew that its allegations were contradicted by the DoH Closure Letter, and therefore false, at the time it broadcast and published the allegations.

**ANSWER: Denied.**

140. Defendant further claimed in its November 12, 2024 written article that "Dyer also performed more complex procedures, according to other patients' medical records."

**ANSWER: Denied as stated. This article contained the following statement: "Dyer also performed intrauterine inseminations on women as well as even more complex procedures, according to other patients' medical records."**

141. The statement regarding "more complex procedures" referred to procedures that were more complex than IUIs.

**ANSWER: Admitted.**

142. The statement regarding "other patients' medical records" refers to CRH patients.

**ANSWER: Admitted.**

143.    No medical record exists of Dr. Dyer performing a procedure at CRH that is more complex than an IUI.

**ANSWER:  Denied.**

144.    Dr. Dyer did not perform any procedure at CRH that was more complex than an IUI.

**ANSWER:  Denied.**

145.    These statements painted a false and defamatory narrative about Dr. Dyer, misrepresenting his professional role and casting aspersions on his character.  Especially egregious was Defendant's decision to re-run some of the most defamatory allegations of impropriety on Dr. Dyer's part after learning, as a result of the DoH Closure Letter and from Dr. Dyer's counsel directly, that those allegations were false.

**ANSWER:  These allegations are legal conclusions to which no response is required. To the extent a response is required, denied.**

146.    As a direct result of these broadcasts and articles, Dr. Dyer has suffered irreparable harm to his reputation, career prospects, and personal well-being.

**ANSWER:  Denied.**

147.    In addition to being false and defamatory, Defendant's broadcasting and publication of the November 12, 2024 broadcast and article when it was on actual notice that its allegations of unlicensed practice were unsubstantiated violated the Scripps Journalism Ethics Guidelines, which state in relevant part:  "For stories that are in-depth, original in research and reporting or involve the unearthing of hidden information, additional fact-checking must be built into the production and editing timeline.  This may include following up with sources, confirming that quotes are accurately represented, rechecking data and making sure factual points are not taken

out of context." A true and correct copy of the Scripps Journalism Ethics Guidelines is attached as Exhibit 11.

> **ANSWER: Denied.**

148.    Dr. Dyer has been actively seeking employment both in the health care industry and other areas since April 2024, but as a result of Defendant's false and defamatory reporting, he has been unable to secure employment despite being invited to interview for multiple positions.

> **ANSWER: Defendant is without knowledge or information sufficient to form a belief as to these allegations and therefore denies them.**

### COUNT I:  DEFAMATION

149.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

> **ANSWER:  Defendant incorporates and re-alleges its answers to each allegation as set forth in the preceding paragraphs of its Answer.**

150.    Defendant published false and defamatory statements concerning Plaintiff, including but not limited to assertions that Plaintiff was "not a doctor," "performed procedures" improperly, and engaged in unethical or criminal conduct such as "sexual assault" and "impersonating a licensed physician."

> **ANSWER: Denied.**

151.    These statements were published with actual malice, reckless disregard for the truth, or gross negligence, as Defendant failed to verify their accuracy despite evidence readily available to refute them, failed to adequately investigate Dr. Dyer's credentials, and relied on unreliable sources.

> **ANSWER: Denied.**

40

152.    At least the November 12, 2024 broadcast and publication were made when Defendant was on actual notice that its story, including its characterization of Dr. Dyer as "not a doctor," would be defamatory.  Defendant's decision to proceed with broadcasting and publishing the story under these circumstances constitutes actual malice.

**ANSWER:  Denied.**

153.    Plaintiff was a private figure at all times, including but not limited to the time of the initial defamatory broadcasts and publications.

**ANSWER:  Denied.**

154.    Plaintiff has suffered significant harm, including reputational damage, emotional distress, and financial loss, as a direct and proximate result of Defendant's defamatory conduct.

**ANSWER:  Denied.**

155.    Defendant's defamatory statements harmed Dr. Dyer's reputation, causing him significant emotional distress and professional damage.  For example, Dr. Dyer has been significantly impaired from seeking employment both within and outside of the health care industry as a result of Defendant's defamatory reporting.

**ANSWER:  Denied.**

156.    The statements published by Defendant accusing Dr. Dyer of criminal impersonation, sexual assault, and improper medical practice constitute defamation per se under Tennessee law.  These statements impute to Dr. Dyer conduct incompatible with the proper exercise of his profession and tend to injure him in his profession.  As a result of these defamatory statements, Dr. Dyer is entitled to presumed damages.

**ANSWER:  Denied.  "[T]he distinction between defamation *per se* and defamation *per quod* is no longer viable" in Tennessee.  *Steele*, 2009 WL 4825183, at \*1, n.2 (citing**

*Memphis Publ'g Co.*, 569 S.W.2d at 420 ("The plaintiff must plead and prove injury from the alleged defamatory words, whether their defamatory meaning be obvious or not."); *Pate*, 959 S.W.2d at 573-74 ("[D]amages must be shown in all defamation cases.")).

157.    The harm to Dr. Dyer's reputation is irreparable and as a result Dr. Dyer has no adequate remedy at law.

**ANSWER:  Denied.**

### COUNT II:  FALSE LIGHT INVASION OF PRIVACY

158.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**ANSWER:  Defendant incorporates and re-alleges its answers to each allegation as set forth in the preceding paragraphs of its Answer.**

159.    Defendant's publications and broadcasts portrayed Plaintiff in a false and highly offensive light, including false and misleading implications that he was unqualified, deceitful, and engaged in improper medical practices and criminal conduct, including sexual assault.

**ANSWER:  Denied.**

160.    Defendant's publications and broadcasts indicating that Dr. Dyer was not a licensed doctor and performed procedures for which a medical license was required were false and misleading and created the false light impression that Dr. Dyer was required to be licensed to perform procedures such as IUIs, and/or performed procedures more complex than an IUI.

**ANSWER:  Denied.**

42

161. Defendant's publications and broadcasts created a false impression of Dr. Dyer that would be highly offensive to a reasonable person, causing him significant emotional distress and reputational harm.

**ANSWER: Denied.**

162. Defendant acted with actual malice or reckless disregard for the truth in publishing these false and misleading statements.

**ANSWER: Denied.**

163. As a result, Plaintiff has experienced severe emotional distress, humiliation, and reputational harm.

**ANSWER: Denied.**

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for relief as follows:

A. That judgment be entered in Plaintiff's favor and against Defendant on all claims;

B. Injunctive Relief: An order requiring Defendant to issue a full and prominent retraction of all false, defamatory, misleading, and tortiously invasive statements made about Dr. Dyer and to remove all related defamatory or false-light content from its platforms, including online articles and videos;

C. Compensatory Damages: In an amount sufficient to compensate Plaintiff for the harm to his reputation and career and emotional distress, to be determined at trial.

D. Punitive Damages: In an amount sufficient to punish Defendant for its malicious, reckless, and defamatory conduct and deter similar conduct, to be determined at trial.

E. That Plaintiff be awarded pre- and post-judgment interest on the damages;

F.     That Plaintiff be awarded his reasonable attorneys' fees and costs incurred in this
       action to the extent permitted by law; and

G.     Such other and further relief as the Court deems just and proper.

**ANSWER:**  **Denied that Plaintiff is entitled to any of his requested relief.**

## **AFFIRMATIVE DEFENSES**

Defendant asserts the following Affirmative Defenses to the claims raised in Plaintiff's Complaint. Defendant does not assume the burden of proof on these defenses where substantive law provides otherwise.

### **First Affirmative Defense**
### (Failure to State a Claim)

Plaintiff's claims are barred in whole or in part because the Complaint fails to state a claim upon which relief can be granted.

### **Second Affirmative Defense**
### (Truth)

Plaintiff's claims are barred in whole or in part because Defendant's allegedly defamatory statements were true and/or substantially true.

### **Third Affirmative Defense**
### (Statement of Opinion)

Plaintiff's claims are barred in whole or in part because Defendant's allegedly defamatory statements were constitutionally-protected opinions (and/or permissible hyperbole).

### **Fourth Affirmative Defense**
### (No Actual Malice or Negligence)

Plaintiff's claims are barred in whole or in part because Defendant did not make the allegedly defamatory statements with actual malice and/or negligence.

### **Fifth Affirmative Defense**
### (No False Light)

Plaintiff's claims are barred in whole or in part because Defendant's statements did not portray Plaintiff in a false light, let alone one that would be highly offensive to a reasonable person.

45

### Sixth Affirmative Defense
(No False Implications)

Plaintiff's claims are barred in whole or in part because Defendant's allegedly defamatory statements contained no false implications concerning Plaintiff.

### Seventh Affirmative Defense
(Defamation-Proof Plaintiff)

Plaintiff's claims are barred in whole or in part because Plaintiff is defamation-proof and Defendant's allegedly defamatory statements did not cause any incremental damage to Plaintiff's reputation.

### Eighth Affirmative Defense
(Privileges)

Plaintiff's claims are barred in whole or in part because Defendant's allegedly defamatory statements are protected and privileged under the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, and under Article 1, Section 19 of the Tennessee Constitution, and under common law. Defendant is entitled to assert both absolute and/or qualified privileges because the allegedly defamatory statements concerned news, matters of public interest, matters of public record, matters regarding official actions and proceedings, and fair comment. And to the extent Plaintiff seeks damages for alleged reputational, emotional, and/or other harm in contravention of well-established law, Defendant's allegedly defamatory statements are privileged by both statute and common law as fair and true reports of official proceedings.

### Ninth Affirmative Defense
(Matters of Public Concern)

Plaintiff's claims are barred in whole or in part because Defendant's allegedly defamatory statements addressed a matter of public concern and are entitled to special protection and

46

privileges under the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, and under Article 1, Section 19 of the Tennessee Constitution, and under common law. Defendant's allegedly defamatory statements are also not actionable to the extent they were made within the sphere of legitimate public interest and/or were reasonably related to matters warranting public exposition.

**Tenth Affirmative Defense**
(Unclean Hands)

Plaintiff's claims are barred in whole or in part by the doctrine of unclean hands.

**Eleventh Affirmative Defense**
(Statute of Limitations)

Plaintiff's claims are barred in whole or in part by the applicable statutes of limitations.

**Twelfth Affirmative Defense**
(No Damages)

Plaintiff's claims are barred in whole or in part because Plaintiff has not suffered and cannot prove any actual harm or compensatory damages as a result or proximate cause of the acts alleged int the Complaint.

**Thirteenth Affirmative Defense**
(Punitive Damages)

Plaintiff's claims are barred in whole or in part because there is no legal or factual basis for an award of punitive damages and any such award would not be constitutionally permissible. Defendant denies that Plaintiff is entitled to any relief, including an award of compensatory or punitive damages. If damages are awarded, however, Defendant asserts as defenses any statutory limitation on damages, including Tenn. Code Ann. §§ 29-39-102 and 29-39-104, and any constitutional limitation on punitive damages, including the Due Process clause of the Fourteenth Amendment. Plaintiff's claim for punitive damages is further barred because Defendants' alleged

statements cannot be the basis for a claim of exemplary or punitive damages as a matter of law because they were not published with both knowledge of falsity or reckless disregard of probable falsity, and common law malice.

To the extent any consideration is given to Plaintiff's request for punitive damages, Defendant is entitled to a bifurcated proceeding. Further, Defendant preserves the defense that Plaintiff does not have a constitutional right to a jury trial on the punitive damages claim. Defendant further asserts that in addition, and/or in the alternative, any claim for punitive damages will be capped by Tenn. Code Ann. § 29-2-104.

### Fourteenth Affirmative Defense
(Lack of Causation)

Plaintiff's claims are barred in whole or in part because there was no causal connection between any of Defendant's alleged actions and Plaintiff's alleged injuries.

### Fifteenth Affirmative Defense
(Lack of Proximate Cause)

Plaintiff's claims are barred in whole or in part because there was no proximate causal connection between any of Defendant's alleged actions and Plaintiff's alleged injuries.

### Sixteenth Affirmative Defense
(Incremental Harm Doctrine)

Plaintiff's claims are barred in whole or in part by the incremental harm doctrine.

### Seventeenth Affirmative Defense
(Acts of Others)

Plaintiff's claims are barred in whole or in part because any injuries or damages Plaintiff incurred (which Defendant expressly denies) were solely, proximately, and directly caused by acts, publications, and/or statements of others over which Defendant exercised no control and/or was entitled reasonably to rely (and did so rely).

### Eighteenth Affirmative Defense
#### (Failure to Mitigate)

Plaintiff's claims are barred in whole or in part because he has failed to mitigate any alleged injury or damages (the existence of which Defendant expressly denies).

### Reservation of Affirmative Defenses

Defendant has not knowingly or intentionally waived any applicable affirmative defenses and reserves the right to assert and rely on such other applicable affirmative defenses as may become available or apparent during the proceedings. Defendant further reserves the right to amend its affirmative defenses accordingly, or to delete affirmative defenses it determines are not applicable during the course of subsequent discovery.

Dated:        February 19, 2025        Respectfully submitted,

**NEAL & HARWELL, PLC**

*/s/  William J. Harbison II*
Ronald G. Harris (BPR # 9054)
William J. Harbison II (BPR # 33330)
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
(615) 244-1713
rharris@nealharwell.com
jharbison@nealharwell.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2025, a true and correct copy of the foregoing has

been served on the following via the Court's electronic filing system:

WADDEY ACHESON LLC
Chanelle Acheson (BPR # 30008)
1030 6th Ave. S., Suite 300
Nashville, TN 37212
(615) 839-1100
chanelle@waddeyacheson.com

*Counsel for Plaintiff*

*/s/ William J. Harbison II*
William J. Harbison II